UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                                    |
                                                    |
BROWN BARK I, L.P.,                                 |        Case No. 1:09-cv-572
                                                    |
         Plaintiff,                                 |
                                                    |
             v.                                     |        HONORABLE PAUL L. MALONEY
                                                    |
TRAVERSE CITY LIGHT & POWER DEPARTMENT,             |
                                                    |
         Defendant.                                 |
                                                    |
_____            |

# OPINION AND ORDER

**Holding that the Tax Injunction Act Does Not Bar Jurisdiction;**
**Denying the Plaintiff's Motion for Summary Judgment;**
**Granting the Defendant's Motion to Dismiss or for Summary Judgment;**
**Directing the Parties to Jointly File a Statement of Damages and Interest by October 14, 2010**


Plaintiff Brown Bark I, L.P. ("BBI") is the owner of a 15-acre parcel of real property in

Elmwood Township, Leelanau County, Michigan, namely Lot 1, Section 33, Town 28 North, Range

11 West ("the property"), *see* Complaint filed June 22, 2009 ("Comp") ¶ 4 and Exhibit ("Ex") 1.

BBI is a Delaware limited partnership which states that its principal place of business is in Texas

and the members of the partnership are citizens of Texas and California, Comp ¶ 1.  Defendant

Traverse City Light and Power Department ("TCLP") is a department of the City of Traverse City

("TC"), a Michigan municipal corporation, Comp ¶ 2.[1]

---
[1]

         BBI states, without contradiction from TCL, that the TC municipal charter makes TCL an
entity suable *in eo nomine*, Comp ¶ 2, and the court has confirmed that TC Charter § 176 permits
the Light and Power Board to sue and be sued in the name of TCLP, *see*

On May 21, 2003, Republic Bank issued a loan to Brewery Creek Development, L.L.C. ("the developer"); in return, the developer granted Republic a mortgage, intending to use the proceeds to develop the property as a 13-unit condominium ("condo"). *See* Comp ¶ 5 and Ex 2 (mortgage recorded seven days later in Leelanau County Register of Deeds Liber 732, Page 897, May 28, 2003).

**On April 1, 2004, the development's property owners' association, the non-profit Brewery Creek Center Condominium Association** – not a party to this lawsuit – **contracted with TCLP for the construction and installation of a street-lighting system on the property, which the developer then owned ("the contract"), Comp ¶ 6.** Under the Lighting Agreement, TCLP did not construct or install the lights. *See* Plaintiff BBI's MSJ Ex 23 (Deposition of Timothy Arends executed March 1, 2010) at 20. Rather, TCLP merely advanced the cost of the equipment and labor. In its entirety, the Lighting Agreement provides as follows:

AGREEMENT FOR STREET LIGHTING

[stating date and names of parties to contract]

RECITALS

A.    Brewery Creek has control of a condominium project called "Brewery Creek Center" in Elmwood Township, Leelanau County, Michigan, on approximately 15.09 acres, which are more fully described on Attachment "A" attached hereto and incorporated herein by reference.

B.    Brewery Creek desires to obtain street lighting for the Brewery Creek Center.

C.    TCL&P desires to provide the street lighting for the Brewery Creek Center and the electricity to service that lighting and the other facilities located in the Brewery Creek Center.

---

http://www.ci.traverse-city.mi.us/charter/charter.htm, link to PDF file at page 55 (TC Municipal Charter, Chapter XVIII) (last retrieved Monday, August 16, 2010).

D.    The condominium unit owners have each executed a Consent to Imposition of Tax Lien which will be recorded with the Register of Deeds.

AGREEMENT

THEREFORE, the parties agree as follows:

1.    Project.  TCL&P shall install or have installed street lighting for the private streets and areas within Brewery Creek as described in the drawing by Nealis Engineering, Inc., Project 02002.  This drawing is Attachment "B", attached hereto and incorporated herein by reference.  Brewery Creek shall make the site and access to the site available at all times to TCL&P, its agents and assigns, for the installation, maintenance and repair of the lighting.

2.    Payment.  Brewery Creek shall pay to TCL&P in equal monthly installments over ten (10) years for the cost of the lighting project, which is currently estimated to be TWO HUNDRED SIXTY-SIX THOUSAND FIVE HUNDRED FORTY AND 00/100 DOLLARS ($266,540.00) plus 10% capital plan funding and 6% interest per annum.  Payments estimated at $3,255 shall commence on June 1, 2004, and continue on the 1st day of each month thereafter until fully paid.  Initial monthly payments shall be based on the estimated cost and adjusted after a final cost determination.

3.    Final Cost Determination.  The final cost of the lighting project will be determined by TCL&P upon final installation and operation of the lighting project.  TCL&P shall make available to Brewery Creek copies of all bills and other charges which are included in the final cost determination.

4.    Ownership.  TCL&P shall own all of the installed lighting equipment, fixtures, conduits, wiring, controls, and other associated materials until Brewery Creek makes payment in full of the above amounts.  Upon final payment by Brewery Creek, together with all outstanding maintenance and repair charges, TCL&P shall convey all lighting equipment, fixtures, conduits, wires, controls, and associated materials to Brewery Creek or its assigns.  Unless otherwise agreed by the parties, conveyance shall be by Bill of Sale conveying the material and equipment on an as-is, where-is basis without warranties express or implied by TCL&P but with any manufacturer warranties.

5.    Late Payments.  * * *

6.    Liens.  If Brewery Creek defaults in its payments to TCL&P, and TCL&P accelerates all indebtedness, in addition to all other remedies available at law or otherwise, TCL&P may place all or part of the indebtedness on the tax

roles [sic] to be assessed against each unit of the condominium project according to the percentages as described in the Brewery Creek Center Condominium under the Master Deed . . . .

This lien shall be first and superior to all other liens and encumbrances on a unit[,] including any liens or encumbrances placed thereon by the condominium association. This lien shall be a tax lien collected in the same manner as all other property taxes. Unit owners have executed and delivered to Brewery Creek Consents to Imposition of Tax [L]iens[,] which have been recorded.

7. <u>Maintenance.</u> * * *

8. <u>Insurance.</u> * * *

9. <u>Electricity.</u> Brewery Creek agrees that TCL&P shall be the sole provider to the lighting project and also to all buildings and facilities using electricity in the Brewery Creek Center until final payment, and thereafter at the discretion of the parties.

IN WITNESS WHEREOF, . . . .

Plaintiff BBI's MSJ Ex 7 at 1-3. TCLP then contracted with a private company called Bay Resource Management, which furnished all the equipment and labor to construct/install the lighting. *See* P's MSJ Ex 1 (Deposition of James Cooper executed March 1, 2010) at 7.

When the Lighting Agreement was executed between the Brewery Creek Condo Association and TCLP on April 1, 2004, TCLP had two alternative policies in place to provide outdoor lighting on customers' land: (1) establishment of a Special Assessment District or (2) adding charges to the customer's monthly electric bill based on the wattage of the lighting installed, *see* Plaintiff BBI's MSJ Ex 5 ¶ 2(Special Assessment District) and Ex 6 (Monthly Rate recovery). The Lighting Agreement did not provide for either a Special Assessment District (i.e., an additional property-tax levy) or a Monthly Rate recovery. The Lighting Agreement did not specify any rate or other terms for TCLP's future sale of electricity to the Brewery Creek developer, the Brewery Creek

condominium association, or the current or future individual-unit owners. Rather, the Lighting Agreement established a 10-year schedule for the Brewery Creek Condo Association to repay the amount advanced by TCLP, plus interest.

It is undisputed that TCLP did <u>not</u> secure the consent of Republic Bank to place any tax lien or other encumbrance on the Brewery Creek property, which was already subject to Republic's mortgage lien before the Lighting Agreement was signed. The mortgage which Brewery Creek Development LLC executed in favor of Republic Bank expressly prohibited the placement of other liens on the Brewery Creek property, and it expressly disclaimed and denied consent to construction or any other activity which could result in such additional liens. The Republic-developer Future Advance Mortgage provided as follows:

> The Mortgagor does and shall own good and marketable title to the Property, free of all easements, liens, mortgages, security interests, encroachments, encumbrances, leasehold interests, rights, claims, and other interests of any nature (herein "Interests"), other than interests which are consented to in writing by the Bank.

Plaintiff BBI's MSJ Ex 2 at 2. Indeed, on March 9, 2004, about three weeks before TCLP and the Brewery Creek developer signed the Lighting Agreement, TCLP's counsel expressed concern that Republic's foreclosure on the mortgage would extinguish TCLP's claim. *See* BBI's MSJ Ex 8.

**In connection with the contract, the developer simultaneously executed a separate Consent to Imposition of Tax Lien document with regard to each of the 13 units of the Brewery Creek condos.** It is undisputed that the pre-existing mortgagee, Republic Bank, did not sign the Consents. The developer's Consents authorize TCLP to impose a lien on the property "in accordance with MCL 141.121" in the event that the developer did not pay TCLP for the lighting system. The developer's Consents further provide that each such lien "shall be a tax lien enforceable by [TCLP] and all taxing jurisdictions." Comp ¶ 6. TCLP recorded the developer's lien consents

with the Leelanau County Register of Deeds ("the Register") in July 2004, *see id.* ¶¶ 16 and 20.  The

provision cited by the developer's Consents provides as follows:

> (1)   Rates for services furnished by a public improvement shall be fixed before the issuance of the bonds.  The rates shall be sufficient to provide for all of the following:  * * *

> (2) The rates shall be revised and fixed by the governing body of the borrower so as to . . . .

> *(3)  Charges for services furnished to a premises may be[2] a lien on the premises, and those charges delinquent for 6 months or more may be certified annually to the proper tax assessing officer or agency[,] who shall enter the lien on the next tax roll against the premises to which the services shall have been rendered, and the charges shall be collected and the lien shall be enforced in the same manner provided for collection of taxes assessed upon the roll and the enforcement of the lien for the taxes.*

> The time and manner of certification and other details in respect to the collection of the charges and the enforcement of the lien shall be prescribed by the ordinance adopted by the governing body of the public corporation.
>
> * * *

MICH. COMP. LAWS § 141.121 (paragraph breaks added to subsection three) (emphasis added).  The

City of Traverse City has adopted such an ordinance in order to avail itself of this provision in §

141.121(3).  *See* Def's MTD/MSJ, Ex F (Traverse City Code of Ordinances § 1046.01).  The court

---

[2]

The statute uses the words "*may* be a lien" instead of "*are* a lien" because "the governing body of the public corporation" – in this case the City of Traverse City – must adopt a suitable implementing ordinance in order to exercise the authority and discretion granted by the statute.  *See, e.g., Saginaw Landlords Ass'n v. City of Saginaw*, 2001 WL 1353641, *2 (Mich. App. Nov. 2, 2001) (per curiam) (P.J. K.F. Kelly, Murphy, Fitzgerald) ("The language of 1933 PA 94, as amended by 1978 PA 216 [MICH. COMP. LAWS § 141.121], is clear and unambiguous.  That statute *permits* a municipality to impose a lien against property for water service provided to that property.  Likewise, the language of defendant's ordinance is clear and unambiguous.  The ordinance adopts the permissive lien created by the 1933 statute and, as a result, defendant possesses the authority . . . to enforce those liens.").  As noted, Traverse City has enacted such an ordinance.

According to WestLaw, *Saginaw Landlords* is the only court decision in any jurisdiction ever to cite MICH. COMP. LAWS § 141.121(3), the relevant provision of the Michigan Revenue Bond Act.

will agree with defendant TCLP that neither the Act nor the corresponding Traverse City ordinance requires the municipality or municipal agency to file a formal lien; rather, qualifying unpaid charges constitute a lien on the subject property until they are paid.

In March 2007, plaintiff BBI purchased Republic Bank's right, title and interest with respect to the mortgage and the property, and the Register recorded the assignment of the mortgage to BBI on April 23, 2007. *See* Comp ¶ 7 and Ex 4 (Liber 398, Page 549); *see also* Plaintiff BBI's MSJ Ex 17 (April 19, 2007 assignment of mortgage from Republic Bank to plaintiff BBI). At the time of the assignment, units 4, 6 and 7 of the Brewery Creek condos had been sold and released from the developer's mortgage, leaving plaintiff BBI to acquire a mortgagee interest in the ten remaining unsold units (numbers 1-3, 5, and 8-13), *see* Comp ¶ 8.

Developer BCD defaulted on the loan secured by the mortgage, so plaintiff BBI foreclosed on the mortgage, with BBI itself buying the property for $445,000 at the foreclosure sale on November 21, 2008. The statutory redemption period expired six months later, on May 21, 2009, and the Sheriff's Deed from the foreclosure sale was delivered to BBI, which asserts undisputed ownership in fee simple absolute of the ten mortgaged condo units. *See* Comp ¶¶ 9 and 19 and Ex 5; *see also* Plaintiff BBI's MSJ Ex 18 (Sheriff's Deed on Mortgage Sale).

The State-Court Action. On November 14, 2008, one week before the foreclosure sale where plaintiff BBI purchased the property, TCLP filed a lawsuit in Leelanau County Circuit Court against developer BCD and the Brewery Creek Center Condominium Association ("the condo association"), Case No. 08-7935-CK ("the state-court action"), Comp ¶ 10. In the state-court action, TCLP claimed that developer BCD and others had breached the 2004 lighting-construction contract by failing to pay TCLP for work performed. TCLP sought about $244,000 in compensatory damages

plus statutory interest from the date of filing. *See* Comp Ex 6 (TCLP's State-Court Complaint against developer BCD).

TCLP did not join BBI in the state-court action. BBI did not find out about the action until about four months after it was filed, in March 2009, from someone who had expressed an interest in buying the property from BBI, Comp ¶ 11. By that time, BBI explains, the state court had entered a consent judgment dated March 16, 2009 in favor of TCLP and against developer BCD for breach of the lighting contract, for about $250,000 plus interest. *See* Comp Ex 7 (TCPL consent judgment against developer BCD). BBI immediately filed a motion to intervene in the now-settled state-court action, which the state circuit judge denied on April 6, 2009, Comp ¶ 12. **Plaintiff BBI alleges that although the judge denied its motion to intervene,**

> [C]ounsel for TCL&P represented to the State Court that TCL&P would agree to an amendment of the Consent Judgment to remove the language permitting TCL&P to enforce the debt as a tax lien on the Property.

Comp ¶ 12. Indeed, on April 2, 2009, TCL&P counsel W. Peter Doren, Esq. wrote a letter to TCL&P stating in pertinent part as follows:

> I received an inch and a half of paper today from an attorney representing Brown Bark I, L.P. to whom Republic Bank assigned their [sic] mortgage recorded on April 23, 2007. The Republic Bank mortgage was recorded May 28, 2003. Our Consents to Imposition of Tax Lien were recorded July 15, 2004. BBI foreclosed on November 21, 2008.

> We know that the foreclosing bank is going to challenge our right to impose the tax lien collection method, but *our case against Brewery Creek was just a contract enforcement action, and the Judgment may have gone too far. Therefore, I am going to have the judgment amended to delete the language as stated in my letter to Jonathan Walton.* This may or may not dissuade them from trying to intervene in this case.

Plaintiff BBS's MSJ Ex 21. BBI next alleges, without contradiction from TCL&P, that

> [s]ubsequently, TCL&P and the other parties to State Court Action signed an

-8-

amended consent Judgment (the "Amended Judgment") which the State Court entered on April 17, 2009. [T]he only relief it grants is a monetary award against BCD.

Comp ¶ 12. In other words, BBI alleges that TCL&P refused or neglected to ensure that the state judge delete the language which purported to authorize TCLP to enforce its judgment as a tax lien on the property. BBI's position also necessarily rests on the view that the state circuit court erred in including and retaining that language in its amended judgment. BBI concludes as follows:

> Notwithstanding its stipulation to entry of the Amended Judgment [in state court], TCL&P has not relinquished its claim [of authority] to impose a tax lien on the Mortgaged Property owned by BBI. TCL&P has not responded to a request from counsel for BBI that TCL&P execute discharges of the Consents, to be recorded with the Leelanau County Register of Deeds.

Comp ¶ 13. Plaintiff BBI does not allege that it filed any motions, or instituted any proceedings, in the circuit court or the Michigan appellate courts to challenge the denial of its intervention motion and the issuance of the amended Developer-TCLP consent judgment.

**BBI advances two reasons why no valid tax lien was ever created under Michigan law:**

**(1)** the process and procedure which TCLP followed in entering the 2004 lighting contract with developer BCD, and in financing the work performed thereunder, "do not satisfy the prerequisites of Michigan law for the imposition of any tax lien";

**(2)** the contractual liability which TCLP claimed was owed by developer BCD "was not incurred for the provision of electricity or other public utility service, but for the sale and installation of street lights on private property", which is "not the type of utility service charge which may be secured by a tax lien under MCL 141.121."

*See* Comp ¶ 16. **Alternately, BBI contends that even if TCLP acquired a valid tax lien through developer BCD's execution of the purported tax-lien consents, that lien was extinguished before the state court ever entered judgment in TCLP's action against BCD.** Specifically, BBI contends that BCD's purported tax-lien "Consents are junior to the Mortgage in the chain of title

. . . ." Comp ¶ 16. (The mortgage now held by plaintiff BBI was executed on May 21, 2003 and recorded on May 28, 2003, while BCD did not execute the tax-lien consents until April 20, 2004, *see* Comp ¶¶ 5-6.) Therefore, BBI reasons, its completion of foreclosure extinguished any valid tax lien granted through BCD's consents, Comp ¶ 16 (citing Mich. Comp. Laws § 16).

> In count one, BBI asks the court to declare the following under Michigan law:
>
> any property interest which TCLP may claim by virtue of BCD's consents is an interest in personal property, not an interest in real estate
>
> neither the Consents nor any other undertaking gives rise to, or provides a basis for, a lien for the payment of taxes or other municipal utility charges with respect to the Mortgaged Property
>
> any interest in the mortgaged property which TCLP may claim was extinguished by the foreclosure of BBI's mortgage, and TCLP has no right, title or interest in the mortgage property

*See* Comp ¶ 17. Count two is a Michigan common-law claim to quiet title, explaining that the BCD purported tax-lien consents recorded by TCLP against the mortgaged units are a cloud on BBI's title to the units, Comp ¶ 20. BBI's quiet-title claim depends on the premise that because BBI's predecessor-mortgagee had an earlier-recorded mortgage lien on the property, BCD had no legal right to "consent" to the imposition of tax liens on the property without obtaining the consent of that mortgagee (now BBI). Therefore, as BBI argued in count one, the quiet-title claim contends that BCD's consents did not create or convey any valid tax lien, and even if they had created such a tax lien, it was extinguished when BBI foreclosed the earlier-recorded mortgage. *See* Comp ¶¶ 21-24.

Count three is a claim for slander of title in violation of Michigan common law and the Michigan slander-of-title statute, Mich. Comp. Laws § 565.108. As damages from TCLP's slander of its title, BBI cites "a lowering of value in the Mortgaged Property, the loss or delay of potential sales of the Mortgaged Property, and continued carrying costs incurred by BBI." Comp ¶ 32. Count

four is a claim for tortious interference with prospective business relationships, again under Michigan common law, *see* Comp ¶¶ 33-37, while count five is a claim for unconstitutional taking of private property and violation of due process in contravention of the United States and Michigan Constitutions, *id.* ¶¶ 38-42 (citing U.S. CONST. Ams. V and XIV, and MICH. CONST. Art. I, Sec. 17). Count six seeks a preliminary injunction enjoining TCLP from taking any steps, during the pendency of this action, to "assess, impose, implement or otherwise cause the filing of a tax lien with respect to the mortgaged property." Prayer for Relief following Comp ¶ 46.

### The TIA Does Not Bar Federal Jurisdiction, as the Charges Here are Not a "Tax."

TCLP contends that the Tax Injunction Act of 1937, 28 U.S.C. § 1341 as amended ("TIA") itself divests this court of subject-matter jurisdiction. The court determines that the TIA does not apply.

With exceptions which do not apply here,[3] the Tax Injunction Act provides as follows:

The district courts shall not enjoin, suspend or restrain the assessment, levy or

---

[3] For example, the federal government is not subject to the TIA if it is challenging the constitutionality of a state tax levied on the federal government or one of its agencies or instrumentalities. *See US v. State of Michigan*, 851 F.2d 803, 805 (6th Cir. 1988) (citing *Dep't of Employment v. US*, 385 U.S. 355 (1966)).

Second, the Supreme Court has recognized an exception to the TIA for Indian tribes which bring federal suit to challenge ongoing state-taxation schemes , *see Keewenaw Bay Indian Cmty. v. Kleine*, 546 F. Supp.2d 509, 523 (W.D. Mich. 2008) (Quist, J.), *judgment aff'd in part and vac'd in part on other grounds*, 569 F.3d 589 (6th Cir. 2009), and Indian tribes may be exempt from TIA-like comity abstention in such cases as well, *see Keewenaw Bay*, 546 F. Supp.2d at 523 (citing *Chippewa Trading Co. v. Cox*, 365 F.3d 538, 545 (6th Cir. 2004)).

Third, *see* former 49 U.S.C. § 11503 (recodification of Railroad Revitalization and Regulatory Reform Act of 1976), *discussed by CSX Transp., Inc. v. Tenn. State Bd. of Equalization*, 964 F.2d 548, 549-50 with n.1 (6th Cir. 1992).

collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341. The TIA's reference to "any tax under *State* law" encompasses local taxes imposed by county or municipal governments acting under the authority of state law. *See Hibbs v. Winn*, 542 U.S. 88, 100 n.1 (2004).

The requirement of a plain, speedy and efficient remedy in state court is not onerous. The Supreme Court has stated that this standard "appears to require a state-court remedy that meets certain minimal procedural criteria." *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 512 (1981). In other words, the TIA does not require a *substantively* adequate state-court remedy. *See Northwest Airlines, Inc. v. Tenn. State Bd. of Equalization*, 11 F.3d 70, 72-73 (6th Cir. 1993) ("*NWA*") (citing *Rosewell*, 450 U.S. at 512, and *Huber Pontiac, Inc. v. Whitler*, 585 F.2d 817, 821 (7th Cir. 1978) (futility of state-court proceedings does not render remedy inadequate, even if plaintiff is faced with recent, precedentially binding state-court opinion contrary to its position).

In our circuit, the requirement is satisfied even if the taxpayer must pay under protest and request a refund, there is some delay in resolving the case, and a judgment in favor of the taxpayer would not include interest accruing in the interim. *See NWA*, 11 F.3d at 73 (citing *Rosewell*, 450 U.S. at 512); *Aluminum Co. of America v. Dep't of Treasury of State of Michigan*, 522 F.2d 1120 (6th Cir. 1975) (TIA barred foreign corporation's action for declaratory relief against State's franchise-fee division that corporation was doing business in Michigan, where State required corporation to pay the fee and then sue for a refund).

Conversely, a plaintiff does not have a plain, speedy and efficient remedy in state court if federal statute provides for exclusive federal jurisdiction in the field, *see Gale v. GM*, 556 F. Supp.2d 689, 701 n.1 (E.D. Mich. 2008) (ERISA) (citing *Thiokol*, 987 F.2d at 380-81) and *Firestone*

*Tire & Rubber Co. v. Bodle*, 645 F. Supp. 305 (N.D. Ohio 1986) (Dowd, J.), or if state-law precedent holds that such a plaintiff lacks standing to challenge the assessment or charge in question, *see Dominion Nat'l Bank v. Olsen*, 771 F.2d 108 (6th Cir. 1985) (TIA did not preclude Virginia banks from federal suit challenging Tennessee statute which taxed earnings on CDs issued to Tennessee residents by out-of-state banks but not earnings on CDs issued by Tennessee banks, as Tennessee Supreme Court had ruled that banks lacked standing to challenge that statute).

Although the TIA expressly prohibits only federal injunctive relief, the Supreme Court has held that the comity considerations animating the Act "'save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure.'" *Howard v. City of Detroit*, 73 F. App'x 90, 94 n.1 (6th Cir. 2003) (Moore, Rogers, D.J. Joseph Hood) (quoting *Great Lakes Dredge & Dock*, 319 U.S. at 299); *see, e.g., Hume v. Sterling*, No. 94-6103, 48 F.3d 1219, 1995 WL 106118, *1 (6th Cir. Mar. 10, 1995) (per curiam) (Kennedy, Krupansky, Norris) (holding that TIA barred district court from entertaining action contending that county's method of assessing residential property was illegal, arbitrary and contrary to Supreme Court decision, panel noted, "The Act . . . even precludes federal courts from declaring state tax laws unconstitutional.") (citing *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 378 (6th Cir. 1993)). Likewise, the Supreme Court reads the comity principles underlying the TIA to prohibit federal district-court jurisdiction even over actions for damages related to state taxation, *Thiokol Corp.*, 987 F.2d at 378 (citing *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 105 (1981)).

Our Circuit has made clear that "the Act applies only when a claimant seeks to 'enjoin' or otherwise hinder 'the assessment, levy or collection' of a state tax." *BellSouth Comms., Inc. v. Farris*, 542 F.3d 499, 501 (6th Cir. 2008). As the Circuit has explained,

consistent with the language of the Act, the Supreme Court has construed it to apply "only in cases . . . in which state taxpayers seek federal court orders enabling them *to avoid paying state taxes.*" *Hibbs v. Winn*, 542 U.S. 88, 107 (2004) (emphasis added). And what the Court has said in construing the Act is consistent with what it has done: [i]t has permitted lawsuits that do not seek to avoid paying taxes, and it has barred lawsuits that do. *Compare, e.g., id.* at 112 (permitting suit challenging tax credits for donations to private-school scholarship funds), *and Jefferson County, Ala. v. Acker*, 527 U.S. 423, 435 (1999) (permitting suit *brought* by a State to collect taxes), *with Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 824 (1997) (barring suit that sought exemption from sales and income taxes), *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982), *and Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 512 (1981) (barring suit that sought to disclaim liability for unpaid taxes).

*BellSouth*, 542 F.3d at 501-502 (parallel citations omitted) (emphasis in original). *See generally Colonial Pipeline Co. v. Morgan*, 474 F.3d 211 (6th Cir. 2007) (discussing when TIA applies), *reh'g & reh'g en banc denied* (6th Cir. Mar. 29, 2007); *see, e.g.,* holding that TIA barred federal district-court jurisdiction, *Wilson v. Bredesen*, 113 F. App'x 70 (6th Cir. 2004) (Sutton, Cook, D.J. Ann Aldrich) (action claiming that State of Tennessee violated Equal Protection Clause by assessing residence at 100% of its value but business personal property at only 85% of its value); *Chippewa Trading Co. v. Cox*, 365 F.3d 538 (6th Cir. 2004) (C.J. Boggs, Batchelder, Sutton) (Indian corporation's section 1983 action challenging constitutionality of Michigan's Tobacco Products Tax Act); *Conley v. York Twp.*, 76 F. App'x 49 (6th Cir. 2003) (per curiam) (Suhrheinrich, Cole, Rogers) (action under 42 U.S.C. § 1983 and False Claims Act contending that state of Michigan and city lacked authority to impose personal property taxes on plaintiff and that their seizure of his bulldozers to pay those taxes violated constitutional rights, FCA and certain treaties); *Dixon v. Oisten*, 62 F. App'x 105, 105-06 (6th Cir. 2003) (per curiam) (Moore, Rogers, D.J. David Katz) (§ 1983 action challenging foreclosure of real property for nonpayment of property taxes).

Our Circuit explains TIA choice-of-law as follows:

> [T]he label given an assessment under state law is not dispositive of whether the assessment is a "tax under state law." Rather, the definition of the term "tax" is a question of federal law, and the issue here is whether the assessment in question is a tax within the meaning of that term as employed by Congress in the Tax Injunction Act.

*Wright v. McClain*, 835 F.2d 143, 144 (6th Cir. 1987) (citations to out-of-Circuit decisions omitted).

The Supreme Court has discussed the distinction between a fee and a tax, albeit not in the TIA context. *See Jefferson Dev. Group, Inc. v. Georgetown Municipal Water & Sewer Serv.*, 2008 WL 687193 (E.D. Ky. Mar. 10, 2008) (Karl S .Forester, Sr. J.). In determining whether the FCC had imposed a forbidden "tax" or a permitted "fee" on a regulated entity, the Supreme Court explained:

> Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. *A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station.* The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

*Jefferson Dev. Group*, 2008 WL 687193 at *3 (quoting *Nat'l Cable TV Ass'n v. US*, 415 U.S. 336, 340-41 (1974)); *see also generally New Jersey v. Anderson*, 203 U.S. 483, 492 (1906) ("Generally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government.").

**When evaluating a charge for purposes of the TIA – at least in the context of compulsory regulatory levies – our Circuit has adopted the approach the First Circuit set forth in *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683 (1st Cir. 1992):**

> The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, [which is] contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it

> may serve such purposes indirectly by, for example, raising money placed in a
> special fund to help defray the agency's regulation-related expenses.

*See Hedgepeth v. Tennessee*, 215 F.3d 608, 612 (6th Cir. 2000) (quoting *San Juan Cellular Tel. Co.*,

967 F.2d at 685). Consistent with this distinction, our Circuit applies a three-factor test to determine

whether a compulsory levy is a tax for TIA purposes. The district court must consider (1) the entity

that imposes the assessment, (2) the parties on whom the assessment is imposed, and (3) whether

the assessment is expended for general public purposes, or used for the regulation and benefit of the

parties on whom it is imposed. *See Hedgepeth*, 215 F.3d at 612 (citing *American Landfill, Inc. v.*

*Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 837 (6th Cir. 1999) (quoting

*Bidart Bros. v. Calif. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996))).

If the assessment falls near the middle of the spectrum between a fee and a tax, the

predominant factor is the revenue's ultimate use: when the ultimate use is to provide a general public

benefit, the assessment is likely a tax, while "an assessment that provides a more narrow benefit to

the regulated companies is likely a fee." *Hedgepeth*, 215 F.3d at 612 (quoting *American Landfill*,

166 F.3d at 838). *See, e.g., Hedgepeth*, 215 F.3d at 612-13 (sum charged by State for issuance and

renewal of disabled-parking placards was a tax, not fee, where the revenues therefrom were

statutorily earmarked for the State's highway fund, the general fund, the police-pay supplement

fund, and the trooper safety fund); *American Landfill*, 166 F.3d at 839-40 ("The revenue's ultimate

use as a benefit shared by the public and not just the waste disposal facilities dictates that the

assessment here is a tax."); *Jefferson Dev. Group*, 2008 WL 687193 at *4 ("tap fees" assessed were

taxes under the TIA because they were assessed to support a government-owned utility service

whose construction, operation and maintenance of water and sewer service benefitted the general

public, the fees were not imposed to regulate or punish the landowners assessed, they did not bestow

a specific individual benefit on the landowners assessed beyond the benefit accruing to the general public, and they were not assessed in response to a request to engage in a regulated activity); *Chattanooga Gas Co. v. City of Chattanooga*, 2007 WL 1387505 (E.D. Tenn. May 7, 2007) (Richard Allan Edgar, J.) (application fees charged by city for temporary-use permits to excavate and make cuts in the pavement of city streets, were a tax for purposes of TIA, because, *inter alia*, revenues therefrom were not used to repair streets after said excavation, as those costs were already separately required to be paid by the excavating company, but for general revenue and not to benefit only a "narrow class of persons of a small segment of the Chattanooga community"); *Wenz v. Rossford, Ohio Transp. Dist.*, 392 F. Supp.2d 931 (N.D. Ohio 2005) (special assessment imposed by municipal transportation district to raise revenue for construction of roads was a tax, not a fee, because it was imposed on all landowners within the district and the revenue did not result in a particular benefit to the plaintiff beyond that enjoyed by the general public from the new or improved roads).

**Subsequent to *American Landfill* and *Hedgepeth*, the Sixth Circuit revisited the standard for determining what constitutes a tax for purposes of the TIA, in *ACLU of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir.) (J. Rogers, joined by J. Nelson, with J. Martin concurring in pertinent part and dissenting on other grounds in part), *cert. denied*, 548 U.S. 906 (2006).** There, a Tennessee statute made available for sale, at the option of the individual automobile owner, a premium-priced license plate bearing the words "Choose Life." *See ACLU*, 441 F.3d at 371-72. By statute, the State charged $35 more for the "Choose Life" plate than for a standard plate, with 50% of the revenues derived from the extra charge going to specified non-profit groups advancing the pro-life cause, 40% to the Tennessee Arts Commission, and 10% to the state's highway fund,

*see id.* at 372. The ACLU and others challenged the "Choose Life" plate statute as a violation of

the free-speech rights recognized by the First Amendment, and the Sixth Circuit held that the lawsuit

was not barred by the TIA, *see id.* at 373. The panel held that the extra charge for the "Choose Life"

plate was not a "tax" for purposes of the TIA, and its reasoning applies squarely here:

> This conclusion is supported by the longstanding distinction drawn in various legal contexts between taxes and ordinary debts. The Supreme Court for instance explained in *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906):
>
>> Generally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government. We think this exaction is of that character. It is required to be paid by the corporation after organization *in invitum* [which means "against an unwilling person"]. The amount is fixed by the statute, to be paid on the outstanding capital stock of the corporation each year, and capable of being enforced by action against the will of the taxpayer. As was said by Mr. Justice Field, speaking for the court in *Meriwether v. Garrett*, 102 U.S. 472, 513 [(1880) (per JJ. Field, Miller and Bradley but speaking for a majority)]:
>>
>>> "Taxes are not debts . . . . Debts are obligations for the payment of money founded upon contract, express or implied. Taxes are imposts levied for the support of the Government, or for some special purpose authorized by it. The consent of the taxpayer is not necessary to their enforcement. They operate *in invitum*. Nor is their nature affected by the fact that in some States . . . an action of debt may be instituted for their recovery. The form of procedure cannot change their character."
>
> *See also Fla. Cent. & Peninsular R.R. Co. v. Reynolds*, 183 U.S. 471, 475 (1902) ("tax" defined as "enforced" contribution and distinguished from ordinary contractual debt); *Patton v. Brady*, 184 U.S. 608, 619 (1902) (same); *Alaska Consol. Canneries v. Territory of Alaska*, 16 F.2d 256, 257 (9th Cir. 1926) (same).

*ACLU of Tennessee*, 441 F.3d at 373-74. The panel went on to apply this reasoning to conclude that

the extra charge for the "Choose Life" license plate was not a tax for purposes of the TIA:

> The Fifth Circuit has relied upon the definition of tax in *Anderson* [(U.S. 1906)] to hold that a challenge to the collection of lease rent payments was not subject to the Tax Injunction Act. The Fifth Circuit explained,

> The State contends that the leases are in fact taxes, and thus the federal courts are barred by the [TIA] from entertaining a challenge to the State's actions to collect on the leases. This contention is without merit. The lease obligations are a creature of contract, not a mandatory obligation imposed by the state as taxes are.

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500 n.13 (5th Cir. 2001). The analysis would apply *a fortiori* to ordinary purchases, like the purchase of government bonds, or the purchase of a souvenir at a state park gift store. Such purchase payments can hardly be termed "taxes" as opposed to ordinary payments on voluntary contracts. This conclusion follows, moreover, regardless of what the government does with the sales income.

> In this case, Tennessee's sales of special plates creates contractual debts to pay but imposes no tax. Instead of using its sovereign power to coerce sales, Tennessee induces willing purchases as would any ordinary market participant. * * * Under *Anderson* [(U.S. 1906)] and *Lipscomb* [(5th Cir. 2001)], these sales constitute regular contractual payments, not taxes.

*ACLU of Tennessee*, 441 F.3d at 374; *cf. Spiers v. Ohio Dep't of Nat. Resources (In re Jenny Lynn Mining Co.)*, 780 F.2d 585, 588 (6th Cir. 1986) (inquiring whether an assessment was a charge for personal service voluntarily engaged, which panel held would not be a tax within the meaning of that term in the Bankruptcy Act, or revenue raising for the public's benefit, which *would* be a tax under the Bankruptcy Act).

**Under the standard enunciated by the Sixth Circuit's published decision in *ACLU of Tennessee* (6th Cir. 2006), which is most precisely on point, the unpaid electrical-lighting charges here are manifestly not a tax for purposes of the TIA.**[4] First, like the license-plate

---

[4] In its opening brief supporting its motion to dismiss the complaint under the TIA, defendant TCLP cites not a single decision of the U.S. Supreme Court or U.S. Court of Appeals for the Sixth Circuit. Instead, TCLP relies only on *Helmsley v. City of Detroit*, 205 F. Supp. 793, 795-96 (E.D. Mich. 1962). It is often appropriate to cite district-court decisions, particularly if they involve facts materially similar to the case at bar, if they explain the applicable law in a particularly clear or eloquent manner, or if they provide examples which usefully illustrate the application of the law.

But a proposition of law must always be supported by citation to binding precedent, and

premium charges in *ACLU*, the lighting charges here were not imposed on BBI and its predecessor against their will, but were voluntarily incurred pursuant to a contractual agreement. BBI's predecessor, the developer, was under no legal obligation to develop these condominiums, much less to enter this particular agreement with TCLP and sign the Consent documents. Likewise, BBI was under no legal obligation to purchase the Brewery Creek condos at the foreclosure sale, thereby assuming (at least initially) the obligation to pay the lighting charges and continuing the consent to have any remaining unpaid charges enforced as if they were tax liens. *See ACLU of Tennessee*, 441 F.3d at 374 ("'The State contends that the leases are in fact taxes . . . . This contention is without merit. The lease obligations are a creature of contract, not a mandatory obligation imposed by the state as taxes are.'") (quoting *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500 n.13 (5th Cir. 2001)); *accord St. Joseph Land Co. v. MacLean*, 32 F.2d 984, 987 (8th Cir. 1929) ("Debts are obligations for the payment of money founded upon contract, express or implied. Taxes are in no sense contractual.") (citing *Meriwether*, 104 U.S. 72, and *Lane Cty. v. Oregon*, 74 U.S. (7 Wall.) 71 (Dec. Term 1868), and *Crabtree v. Madden*, 54 F. 426 (8th Cir. 1893)).

To put it another way, the lighting charges became a debt due and payable to TCPL by virtue of a voluntary contract which Traverse City entered in its corporate or proprietary capacity, not its sovereign capacity. *See Liberty Mut. Ins. Co. v. Johnson Shipyards Corp.*, 6 F.2d 752, 755 (2d Cir. 1925) (J. Rogers, joined by J. Manton, with J. Hand concurring separately and concurring in pertinent part) ("A debt is not a tax, and a tax is not a debt. Debts are due to the government in its corporate capacity. Taxes are due to it in its sovereign capacity. A debt is a sum of money due upon

---

district-court decisions never have precedential force beyond the parties and their privies. *See US v. Flores*, 477 F.3d 431, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) ("*Johnson* is a district court opinion and, therefore, not binding on this court . . . .").

contract, express or implied, or one which is evidenced by a judgment."), *aff'd w/o opinion sub nom. Stripe v. US*, 269 U.S. 503 (1926) (Butler, J., for a unanimous Court).

Second, the lighting-work charges at issue here were not an instance of some burden generally imposed on some class of individuals, corporations, or landowners for the purpose of supporting the Traverse City government generally, nor even for the purpose of supporting some public-improvement project mandated by Traverse City, Grand Traverse County, or the State of Michigan. But for the voluntary decisions of private parties, including the Brewery Creek developer, the concomitant lighting work never would have occurred, and the debt never would have come into being. The charges were voluntarily incurred and agreed to only by the developer, and in turn, by foreclosure buyer Brown Bark, to pay for a specific project undertaken primarily for the private benefit of the developer/Brown Bark, and its members/investors, and a small group of condo owners. *See ACLU*, 441 F.3d at 373 ("Generally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government. * * * "' * * * Taxes are imposts levied for the support of the Government, or for some special purpose authorized by it.'") (quoting *NJ v. Anderson*, 203 U.S. 483, 492 (1906) (quoting *Meriwether v. Garrett*, 102 U.S. 472, 513 (1880) (per JJ. Field, Miller and Bradley))); *contrast Kunkle v. Fulton Cty. Bd. of Comm'rs*, No. 90-3261, 922 F.2d 841, 1991 WL 1120, *1-2 (6th Cir. Jan. 8, 1991) (per curiam) (Krupansky, Guy, Suhrheinrich) (charge imposed on property-owners to fund county ditch improvements constituted a tax for purposes of the TIA) (citing *Lake Lansing Special Assessment Protest Ass'n v. Ingham Cty. Bd. of Comm'rs*, 488 F. Supp. 767, 772-73 (W.D. Mich. 1980) (Enslen, J.) (holding that TIA's term "tax" includes special assessments levied by municipal corporations)).

**Finally, having determined that the lighting charges at issue here are voluntary**

**contractual debts rather than taxes, they cannot be somehow transformed into taxes merely because the contract authorized another party to collect the contractual liability through means ordinarily reserved for the collection of taxes.** *See Moore v. Mitchell*, 30 F.2d 600, 602 (2d Cir. 1929) (J. Manton Hand, joined by J. Augustus Hand, with J. Learned Hand concurring separately and concurring in pertinent part) ("Taxes are imposts, not debts, collected for the support of Government. *The form of procedure to collect them cannot change their character.*") (emphasis added) (internal citation omitted) and *Levine v. Levine*, 209 F. Supp. 564, 566-67 (D. Del. 1962) ("'a tax, therefore, is no sense a debt, within the ordinary meaning of that term. Perhaps it may be made a debt by the provisions of the particular statute where such an intent clearly appears (citations) [sic], but the mere fact that a statute provides for the collection of a tax, by an action of debt, * * * is not sufficient to make it a debt, within the ordinary meaning of the term.'") (appearing to quote COOLEY ON TAXATION §§ 22 and 1329 and/or DILLON ON MUNICIPAL CORPORATIONS § 1414).

Final Note on the Inapplicability of the TIA.

Because *ACLU* was issued by a standard three-judge panel, of course, it could not overrule or modify the earlier published decisions in *American Landfill* (6th Cir. 1999) and *Hedgepeth* (6th Cir. 2000). *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1095 (6th Cir. 2010) (Richard Allen Griffin, J.) ("It is a well-established rule in this Circuit that a panel of this court may not overrule a prior published opinion of our court absent *en banc* review or an intervening and binding change in the state of the law.") (citing, *inter alia*, *Salmi v. HHS*, 774 F.2d 685, 689 (6th Cir. 1985)), *reh'g & reh'g en banc denied* (6th Cir. July 29, 2010).

But *ACLU* did not purport to overrule or modify those decisions. Nor does *ACLU*'s rationale

conflict with their holdings or rationale. Rather, the test enunciated in *American Landfill* and *Hedgepeth* "was created to answer a different question: whether a regulatory fee, often directed to a segregated fund for a special use related to the basis for imposing the fee, is or is not a tax for TIA purposes." *ACLU*, 441 F.3d at 374 (citation omitted). The *American Landfill-Hedgepeth* test does not apply here, because "[t]he test for determining which compelled exactions are taxes and which are fees cannot logically be used to determine whether a payment is or is not a compelled exaction in the first place." *Id.* at 375.

Moreover, even if *ACLU* conflicted with *American Landfill* and *Hedgepeth*, that would not change the outcome today. If there were such a conflict, the court would be obligated to follow the earlier decisions instead of *ACLU* in any area of conflict. *See Michigan Elec. Emp. Pension Fund v. Encompass Elec. & Data, Inc.*, 556 F. Supp.2d 546, 570 n.13 (W.D. Mich. 2008) ("To the extent that *Resilient* conflicts with *Allcoast*, this court must follow *Allcoast* because it was issued first.") (citing *US v. Tate*, 516 F.3d 459, 467 (6th Cir. 2008) ("When a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case.")); *see, e.g., McMann v. McQuiggin*, 2010 WL 2232485, *2 (W.D. Mich. May 28, 2010) (Maloney, C.J.) ("Although *Abela* is a published decision, it is an aberration, a departure from the standard . . . announced in earlier published Sixth Circuit decisions. [The earlier decisions] are binding and no *en banc* panel has overruled them.") (internal citations omitted).

Applying *American Landfill* and *Hedgepeth* instead of *ACLU*, this court would still hold that the charges at issue in the instant case do not constitute a tax for purposes of the TIA. First, the amounts which TCLP seeks to collect from plaintiff Brown Bark here were charged only to Brown Bark's predecessor (Brewery Creek Development, LLC), not to any broader class of businesses,

persons, or property-owners. Second, the amounts charged were not imposed coercively, but were charged only as a result of a voluntary contractual agreement which Brown Bark's predecessor entered into with defendant TCLP and others. Third, there is no credible or substantiated notion that the amounts TCLP seeks to collect from Brown Bark will redound equally to all members of the general public, rather than especially and predominantly to the benefit of the owners and occupants of the units in the Brewery Creek condos. *See Hedgepeth*, 215 F.3d at 612; *American Landfill*, 166 F.3d at 838.

Because the charge at issue does not constitute a "tax", the TIA does not apply. There is no need to consider the second criterion for application of the TIA, i.e., whether the State of Michigan would provide plaintiff BBI with a plain, speedy, and efficient remedy for these claims in its courts.


**Court Declines to Consider Additional Belatedly-Asserted Bases for Dismissal.**

Defendant TCLP's reply brief concludes by throwing in this argument: "Even if the court were to conclude that the charges at issue were not a 'tax' for purposes of the Tax Injunction Act, they are at a minimum a utility charge under the [f]ederal Johnson Act (28 U.S.C. § 1342) which also deprives this Court of jurisdiction." Def's Reply (Doc 27) at 10 n.2.

It is well settled that arguments or issues raised for the first time in a reply brief are customarily disregarded. *See Bank One, N.A. v. Echo Acceptance Corp.*, Nos. 08-4571 & 09-3125, – F. App'x –, – n.8, 2010 WL 2545516, *10 n.8 (6th Cir. June 15, 2010) (Gibbons, Griffin, D.J. David Dowd) ("[D]efendants forfeited our review of this issue by not raising in their initial brief.") (citing *US v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006)). *See, e.g., US v. Lockett*, 359 F. App'x 598, 612-13 (6th Cir. 2009) (Batchelder, Gibbons, Chief D.J. Maloney) ("In his reply brief, Lockett

makes . . . a number of overlapping arguments . . . . * * * These arguments were not made in Lockett's opening brief on appeal, so they are waived.") (citing, *inter alia*, *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004) ("Oracle argues that the punitive damages award is constitutionally excessive . . . . This argument was raised for the first time in Oracle's reply brief, and this court has consistently held that we will not consider such arguments.")), *cert. denied*, – U.S. –, 130 S.Ct. 2420 (2010); *Hadley v. US*, 2010 WL 2573490, *7 (W.D. Mich. June 22, 2010) (Quist, J.) ("It is well established that a party . . . may not raise an argument for the first time in a reply brief.") (citing, *inter alia*, *US v. McCorkle*, 2010 WL 2131907, *7 (W.D. Mich. Mar. 30, 2010)).

One rationale for this practice is that raising a new argument in a reply brief does not afford the opposing party an opportunity to respond within the briefing contemplated by the rules, *see Reeves v. Wolever*, 2009 WL 5196157, *3 (W.D. Mich. Dec. 23, 2009) (citing *NLRB v. Int'l Health Care, Inc.*, 898 F.2d 501, 506 n.5 (6th Cir. 1990)). The only way for the opposing party to respond is to obtain leave to file a sur-reply. Granting such leave complicates and slows the progress of the litigation unnecessarily by adding a fourth, and perhaps a fifth brief regarding a single motion. "Solving" the problem of the movant's belated reply-brief argument by granting the other side leave to file a sur-reply would also weaken the incentive for parties to thoroughly research and "think through" a case before filing their opening motion briefs. This is the second rationale for the practice of disregarding arguments made for the first time in a reply brief.

Accordingly, the court rarely grants leave to file a sur-reply as an alternative to simply disregarding the belatedly-asserted argument, and it will not do so here. *See IMTT-Illinois, Inc. v. Chemical Bank*, 2009 1651291 (W.D. Mich. June 11, 2009) (disregarding argument raised for first time in defendant's reply brief, rather than entertaining issue and granting plaintiff leave to file sur-

reply), *subsequent determination*, 2009 WL 2423756 (W.D. Mich. Aug. 4, 2009) (same with regard to new argument raised in *plaintiff's* reply brief), *subsequent determination*, 2009 WL 3270276, *3 n.1 (W.D. Mich. Oct. 5, 2009) ("Matex's opening brief in support of its motion for summary judgment does not mention MICH. COMP. LAWS § 440.5109. Likewise, Chem Bank's opening brief in support of *its* motion for summary does not mention MICH. COMP. LAWS § 440.5109. Accordingly, neither party is entitled to rely on MICH. COMP. LAWS § 440.5109 in seeking summary judgment.") (citing, *inter alia*, *Irwin Seating Co. v. IBM Corp.* 2007 WL 518866, *2 n.2 (W.D. Mich. Feb. 15, 2007) (Robert Holmes Bell, C.J.) (citations omitted)).

Moreover, TCLP failed to provide any discussion in support of its assertion that the Johnson Act deprives this court of subject-matter jurisdiction. "'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.5 (6th Cir. 2010) (Griffin, J.) (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009); *see, e.g., US v. Lockett*, 359 F. App'x 598, 613 (6th Cir. 2009) (Batchelder, Gibbons, <u>Chief D.J. Maloney</u>) (citations omitted), *cert. denied*, – U.S. –, 130 S.Ct. 2420 (2010).

<u>By Operation of Law, TCL&P Acquired a Lien for Payment of The Charges.</u>

As noted above, plaintiff BBI contends that no valid tax lien was ever created in favor of defendant TCL&P. BBI advances two reasons for this contention:

**(1)**      the contractual liability which TCLP claimed was owed by developer BCD "was not incurred for the provision of electricity or other public utility service, but for the sale and installation of street lights on private property", which is "not the type of utility service charge which may be secured by a tax lien under MCL 141.121."

-26-

**(2)**     the process and procedure which TCLP followed in entering the 2004 lighting

contract with developer BCD, and in financing the work performed thereunder, "do

not satisfy the prerequisites of Michigan law for the imposition of any tax lien";

*See* Comp ¶ 16.  BBI's arguments lack merit.

**Next, BBI contends that even if TCLP acquired a valid tax lien through developer BCD's execution of the purported tax-lien consents, that lien was extinguished before the state court ever entered judgment in TCLP's action against BCD.**  Specifically, BBI contends that BCD's purported tax-lien "Consents are junior to the Mortgage in the chain of title . . . ."  Comp ¶ 16.  (The mortgage now held by plaintiff BBI was executed on May 21, 2003 and recorded on May 28, 2003, while BCD did not execute the tax-lien consents until April 20, 2004, *see* Comp ¶¶ 5-6.)  Therefore, BBI reasons, its completion of foreclosure extinguished any valid tax lien granted through BCD's consents, Comp ¶ 16 (citing Mich. Comp. Laws § 16).  BBI relies on Michigan's general recording statute, which at the relevant times provided as follows:

(1)     In the entry book of deeds, the register shall enter all deeds of conveyance absolute in their terms, and not intended as mortgages or securities, and all copies left as cautions.

In the entry book of mortgages, the register shall enter all mortgages and other deeds intended as securities, and all assignments of any mortgages or securities.

In the entry book of levies, the register shall enter all levies, attachments, liens, notices of *lis pendens*, sheriffs' certificates of sale, United States marshals' certificates of sale, other instruments of encumbrances, and documentation required under subsection (2), noting in the books the day, hour, and minute of receipt, and other particulars, in the appropriate columns in the order in which the instruments are respectively received.

(2)     Except as otherwise provided in subsection (3), the recording of a levy,

attachment, lien, *lis pendens*, sheriff's certificate, marshal's certificate, or other instrument of encumbrance does not perfect the instrument of encumbrance unless both of the following are found by a court of competent jurisdiction to have accompanied the instrument when it was presented to the register for entry:

    (a)    A full and fair accounting of the facts that support recording of the instrument of encumbrance and supporting documentation, as available.

    (b)    Proof of service that actual notice has been given to the recorded landowner of the land to which the instrument of encumbrance applies.

(3)    subsection (2) does not apply to any of the following:

    (a)    A tax lien that is not required to be recorded pursuant to the general property tax act, Act No. 206 of the Public Acts of 1893, being sections 211.31 to 211.157 of the Michigan Compiled Laws.

    (b)    The filing of an instrument of encumbrance authorized by state statute or federal statute.

    (c)    * * *
    (d)    * * *
    (e)    * * *

(4)    The instrument shall be considered as recorded at the time so noted and shall be notice to all persons . . . of the liens, rights, and interests acquired by or involved in the proceedings. *All subsequent owners or encumbrances shall take subject to the perfected liens, rights, or interests.*

(5)    A person who is not exempt under subsection (2) who encumbers property through the recording of an instrument listed under subsection (1) without lawful cause with the intent to harass or intimidate any person is liable for the penalties set forth in section 2907a of the revised judicature act of 1961, 1961 PA 236, MCL 600.2907a.

Mich. Comp. Laws § 565.25 (¶ breaks added in subsection 1, emphasis added in subsection 4).[5]

---

[5]This section was amended by P.A. 208, No. 357, immediately effective December 23, 2008. From December 23, 2008 through the present, this section provides as follows:

Therefore, BBI reasons, TCL&P took its purported lien interest in the Brewery Creek property (which did not come into being until April 2004) subjected to the perfected lien of BBI's predecessor, which was recorded about eleven months earlier on May 28, 2003. BBI writes as follows:

> The recording of the [Republic Bank] mortgage [in May 2003] notified TCL&P of Republic Bank's superior claim. That notice included the prohibition against further liens in Section 2 of the Mortgage, ". . . the Mortgagor does and shall own good and marketable title to the Property, free of all liens . . . ." Also . . . Section 23 of the Mortgage makes clear that the Bank was not going to pay for additions or improvements. Exhibit 2, at p. 9.

> Thus, not only was the [May 2003 Republic Bank] mortgage first in priority, but it

---

(1)    Except as otherwise provided in subsection (2), the recording of a levy, attachment, lien, *lis pendens*, sheriff's certificate, marshal's certificate, or other instrument of encumbrance does not perfect the instrument of encumbrance unless both of the following are found by a court of competent jurisdiction to have accompanied the instrument when it was delivered to the register under section 24(1) of this chapter [Mich. Comp. Laws § 565.24(1)].

        (a)    A full and fair accounting of the facts that support recording of the instrument of encumbrance and supporting documentation, as available.

        (b)    Proof of service that actual notice has been given to the recorded landowner of the land to which the instrument of encumbrance applies.

(2)    Subsection (1) does not apply to any of the following:  * * *

(3)    A person who is not exempt under subsection (2) who encumbers property through the recording of an instrument listed under subsection (1) without lawful cause with the intent to harass or intimidate any person is liable for the penalties set forth in section 2907a of the revised judicature act of 1961, 1961 PA 236, MCL 600.2907a.

MICH. COMP. LAWS § 600.25 (Dec. 23, 2008 through present). Neither party contends that the newer version applies to this controversy, and the court determines that it does not apply.

specifically alerted TCL&P that it could not look to the mortgagee to pay for the lighting system. There is also no evidence of any express or implied consent, or even prior knowledge, by Republic Bank to the Lighting Agreement, any of the work performed under that Agreement, or any debt or lien resulting therefrom.

When BBI foreclosed on the Mortgage and no one redeemed, any interest in the Property TCL&P may claim by virtue of the Consents ceased to exist. MCL 600.3130 provides:

> [The Sheriff's] deed shall thereupon become operative, and shall vest in the grantee therein named, his heirs or assigns, all the right, title, and interest which the mortgagor had at the time of the execution of the mortgage, or at any time thereafter.

In other words, when the redemption period expired, the clock was turned back to 2003 when the Mortgage was given, and subsequent interests, including the 2004 Consents, were extinguished. Long-standing Michigan authority has recognized that junior liens do not survive foreclosure. *Hansen v. Huetter*, 339 Mich 130, 62 NW2d 663 (1954) . . . .

Under MCL 600.2932, BBI is entitled to entry of any order discharging the Consents because they were extinguished by foreclosure. The statute provides:

> (1) Any person, whether he is in possession of the land in question or not, who claims any right in, title to, equitable title to, interest in, or right to possession of land, may bring an action in the circuit courts against any other person who claims or might claim any interest inconsistent with the interest claimed by the plaintiff, whether the defendant is in possession of the land or not.
> * * *
> (3) If the plaintiff established his title to the lands, the defendant shall be ordered to release to the plaintiff all claims thereto . . . .

The completion of foreclosure left BBI's title to the Mortgaged Property free and clear of any interest of TCL&P arising under the Consents. * * *

Plaintiff BBI's MSJ at 11-13.

**But BBI's argument on this score is readily rebutted on several grounds. First, TCL&P correctly notes that its lien against the Brewery Creek property arose by operation of law, as provided by statute, without any need to rely on any private contract or other written**

**undertaking, and without the need to file a lien.**  In other words, TCL&P's lien against the Brewery Creek property for unpaid Lighting Agreement charges did not depend on the execution or validity of the "Consents."  Under the Revenue Bonding Act,

> Charges for services furnished to a premises may be a lien on the premises, and those charges delinquent for 6 months or more may be certified annually to the proper tax assessing officer or agency[,] who shall enter the lien on the next tax roll against the premises to which the services shall have been rendered . . . .

MICH. COMP. LAWS § 141.121(3) .  Plaintiff BBI has identified no requirement that the government utility entity which is owed the charges must file a specific lien or obtain the delinquent party's consent before the unpaid charges will cause the formation of a lien – and not just a lien, but a lien enforceable on the tax rolls.  The court finds no such requirement in § 141.121(3), nor in any other section of the Revenue Bonding Act, nor in the ordinance which Traverse City enacted to implement and be eligible for the protection of § 141.121(3).  So long as the municipality's governing body has enacted an ordinance exercising its § 141.121(3) authority, *see Saginaw Landlords Ass'n v. City of Saginaw*, 2001 WL 1353641, *2 (Mich. App. Nov. 2, 2001), the lien automatically comes into being as soon as the private party incurs the "charges for services furnished to [its] premises," MICH. COMP. LAWS § 141.121(3).  Thus, by operation of the statute and the municipal implementing ordinance, TCL&P's lien against the Brewery Creek property came into being each time that TCL&P furnished (provided or paid for the provision of) lighting installation, maintenance or repair of the corresponding electricity current to that property.

**Second, the existence and enforceability of TCL&P's lien in no way depends on whether the unpaid Lighting Agreement charges are a "tax" for purposes of the TIA or otherwise.** Michigan statute clearly provides that public-utility charges delinquent for more than six months are to be *treated like* unpaid taxes.  The aforementioned section of the Revenue Bonding Act concludes

by stating, "the charges shall be collected and the lien shall be enforced in the same manner provided for collection of taxes assessed upon the roll and the enforcement of the lien for the taxes." MICH. COMP. LAWS § 141.121(3).

**Third,** to ascertain the "manner provided for collection of taxes assessed upon the roll", which applies to unpaid government-utility charges just like unpaid property taxes, the court must consult Michigan statutes other than the Revenue Bonding Act. Upon doing so, the court determines that Michigan's General Property Tax Act, MICH. COMP. LAWS § 211.55 *et seq.*, conclusively supports TCL&P's position. MICH. COMP. LAWS § 211.60a(4) provides as follows:

> The people of this state have a valid lien on property returned for delinquent taxes, with rights to enforce the lien as a preferred or first claim on the property. The right to enforce the lien is the *prima facie* right of this state and shall not be aside or annulled except in the manner and for the causes specified in this act.[6]

Because the Revenue Bond Act (MICH. COMP. LAWS § 141.121(3)) treats delinquent government-utility charges the same as delinquent property taxes for purposes of lien priority and collection, the General Property Tax Act (MICH. COMP. LAWS § 211.60a(4)) made TCL&P's automatic lien the "preferred or first claim" against the Brewery Creek property. That means that TCL&P's delinquent-charges lien was *never* junior to the Republic/BBI mortgage lien in the first place. Accordingly, by statute, the foreclosure sale of the Brewery Creek property pursuant to the mortgage lien could not have extinguished TCL&P's superior, senior interest in that property.

**Fourth, the court rejects plaintiff BBI's assertion that the unpaid Lighting Agreement charges are not the type of charges which the Michigan Revenue Bond Act** (specifically MICH.

---

[6]Section 211.60a has not been amended since its enactment eleven years ago, before any of the relevant events in this case occurred. *See* P.A. 1893, No. 206, § 60a, added by P.A. 1999, No. 123, effective Oct. 1, 1999.

COMP. LAWS § 141.121(3)) **treats as equivalent to unpaid taxes for the purposes of lien and collection.** BBI bases this argument on the context, especially the subsections immediately preceding § 141.121(3):

> In entering into the Lighting Agreement, TCL&P was not engaged in the type of activity MCL 141.121 was meant to protect or otherwise regulate. This can be seen through a review of the particular elements of the statutory language. [S]ubsection 1 of the statute . . . deals with "rates" for "services" furnished by a "public improvement . . . ," which are to be set before the issuance of bonds. Paragraphs (a) through (d) of the statute provide guidelines to establish the amount of the "rates" for the "services." Subsection 2 of the statute deals with requirements that the public body issuing the bonds maintain . . . rates . . . sufficient to finance the bonds.

> Subsection 3 of the statute, which contains the lien provision upon which TCL&P relies[,] speaks again in terms of, "Charges for *services* furnished to a premises." TCL&P presumably contends that anything it charges for constitutes "services" under subsection 3, and can be collected through tax liens. This is wrong. The language which precedes subsection 3 is a progression that requires the municipality to fix rates for services furnished through a public improvement; ties the amount of rates to payments on bonds; specifies provisions in ordinances pertaining to the rates, the services, and the bonds; and finally addresses collection of charges resulting from all the foregoing. Into this mix, TCL&P would drop the Lighting Agreement, which involved **no** rates, **no** public improvement, **no** bonds, and **no** ordinance.

> * * * It is a basic rule of statutory construction that context is key to determining a statute's scope and meaning. As the Michigan Supreme Court held in *Potter v. McLeary*, 484 Mich. 396, 774 N.W.2d 1, 15 (Mich. 2009) (emphases added):

>> * * * **[W]hen considering the correct interpretation, the statute must be read as a whole. Individual words and phrases, while important, must be read in the context of the entire legislative scheme.** In defining particular words in statutes, we must consider both the plain meaning of the critical word or phrase **as well as its placement and purpose in the statutory scheme.**

> The correct interpretation of the statute is that lien claims are only available [sic, should be "available only"] for recovery of charges for utility service such as electric power, furnished through bond-financed public improvements, and priced on the basis of rates.

P's MSJ at 15-17. Given the difficulty of this novel issue, it is logical that plaintiff BBI would

attempt to fall back on an established canon of statutory construction. Despite plaintiff's well-written briefs, however, that canon is of no avail to it here, and its argument fails.

In other circumstances, it might be appropriate to clarify the meaning of subsection 3's "charges for services" by reference to the context provided by subsections 1 and 2. Subsections 1 and 2 provide little or no context here, however, because their provisions about "rates" in relation to "bonds" have no application to this situation. No bonds were ever issued to fund TCL&P's furnishing (through advance funding) of electrical equipment installation, maintenance and repair. Accordingly, subsection 1 and 2's requirements with regard to when rates must be set, how rates must be set, and how rates must relate to bond indebtedness are inapposite. Yet it cannot be said that the Michigan Legislature intended MICH. COMP. LAWS § 141.121(3)'s lien provision to apply only to government-utility charges for "public improvements" funded by bonds and repaid by rates set in order to pay off those bond obligations. Such a narrow interpretation of the applicability of MICH. COMP. LAWS § 141.121(3) cannot be squared with MICH. COMP. LAWS § 141.104, which expressly provides, "The powers in this act granted may be exercised notwithstanding that no bonds are issued hereunder." *See Bolt v. City of Lansing*, 459 Mich. 152, 174, 587 N.W.2d 264, 275 (Mich. 1998) ("The statute specifically states that the powers granted in the Revenue Bond Act 'may be exercised notwithstanding that no bonds are issued hereunder.'"); *Sabaugh v. City of Dearborn*, 384 Mich. 510, 517, 185 N.W.2d 363, 365 (Mich. 1971) (same).

Moreover, section 141.121(3) authorizes tax-like lien/collection measures for "charges for services furnished to a premises", and the Michigan Supreme Court would likely hold that these "services" are not restricted to the provision of electric current itself. Subsection 1 begins by referring not merely to "rates for services" but "rates for services furnished by a public

-34-

improvement." In turn, MICH. COMP. LAWS § 141.103(b) defines "public improvement" broadly to include "utility systems for supplying light, heat or power, *including plants, works, instrumentalities, and properties used or useful in connection with those systems*." Emphasis added.

Lastly, even if the court focused on the term "rates" used in subsection 141.121(1) and (2), as BBI attempted to do in providing context for the meaning of the terms in subsection (3), that would only strengthen the conclusion that the latter's reference to "services" is not restricted to the provision of electric current. MICH. COMP. LAWS § 141.103(e) defines "rates" as "the charges, fees, rentals, and rates that may be fixed and imposed for the services, *facilities, and commodities* furnished by a public improvement." Emphasis added. This definition of rates is significant in two respects. First, the definition of "rates" treats "charges" and "rates" as two conceptually distinct items; this suggests that MICH. COMP. LAWS § 141.121(3)'s term "charges" is not limited to the rates which the Brewery Creek owners/occupants pay for electrical current itself. Second and more important, the definition of "rates" directly distinguishes between "services" (such as the transmission of electric current) and "facilities" (such as the equipment and infrastructure whose installation, repair and maintenance TCL&P funded and arranged, i.e. furnished, before transmission could even begin). In the case of electricity, the facilities are necessary to the provision of the service, but as the statute recognizes, that they are not the same thing. *Cf. City of North Muskegon v. Bolema Const. Co.*, 56 N.W.2d 371, 335 Mich. 520 (Mich. 1953) (sewer pipes and fittings running from sewer mains to property lines of the users were "facilities" within the meaning of the Revenue Bond Act).

Conclusion. For all these reasons, not only electric-transmission charges, but *all* the charges which TCL&P and its predecessor-in-interest incurred pursuant to the Lighting Agreement are

subject to the lien created by M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 141.121(3) and Traverse City's implementing

ordinance. Under M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 141.121(3), that lien arose by operation of law as soon as

a particular charge was incurred, and a lien in the amount of each charge became certifiable to the

tax assessor when that charge went unpaid for six months. Under M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 211.60a(4),

the utility-charge lien was and is the "first and preferred claim" on the Brewery Creek property,

taking precedence over the Republic/BBI mortgage lien. In short, BBI is not entitled to declaratory

or any other relief,[7] and TCL&P is entitled to collect all delinquent Lighting Agreement charges as

if they were delinquent property taxes.


## ORDER

---

[7]

**In count three, BBI asserts a common-law and statutory claim for slander of its title to the Brewery Creek property.** BBI contends that "[i]n refusing to discharge the Consents, TCL&P deliberately allowed the record title to reflect that it had tax lien rights." P's MSJ at 19. In Michigan, the elements of a common-law claim for slander of title are falsity, malice, and special damages. *See B&B Inv. Group v. Gitler*, 229 Mich. App. 1, 8, 581 N.W.2d 17, 20 (Mich. App. 1998) (citing *Sullivan v. Thomas Organization, P.C.*, 88 Mich. App. 77, 82, 276 N.W.2d 522, 525 (Mich. App. 1979) (citing, *inter alia*, *Harrison v. Howe*, 109 Mich. 476, 67 N.W. 527 (Mich. 1896))). "The same three elements are required in slander of title actions brought under M.C.L. § 565.108 . . . ." *B&B Inv. Group*, 229 Mich. App. at 8, 581 N.W.2d at 20 (citing *GKC Michigan Theaters, Inc. v. Grand Mall*, 222 Mich. App. 294, 301, 564 N.W.2d 117, 120 (Mich. App. 1997)).

Because TCL&P *does* have tax-like lien rights as to the Brewery Creek property, BBI cannot establish the falsity element, so it fails to state a claim for slander of title. This obviates the need to consider TCL&P's alternative arguments that the slander-of-title claim is barred by a one-year statute of limitations and by M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 691.1407(1) governmental immunity.

**In count two**, BBI seeks to quiet title. **In count four**, BBI asserts a common-law claim for tortious interference with prospective business relationships. **In count five**, BBI asserts a claim for unconstitutional taking of private property and a violation of its due process rights. These claims fail for the same reason as the preceding counts: TCL&P lawfully has the tax-like lien and collection rights against the Brewery Creek property which it has asserted. **Count six's request for injunctive relief** fails because there is no actual or threatened unlawful action to enjoin.

Plaintiff's motion to dismiss defendant's counterclaim, and for summary judgment on counts one, two and three **[document # 19] is denied**.

Defendant's motion to dismiss or for summary judgment **[doc # 21] is GRANTED**.

Summary judgment is **GRANTED** to Defendant on all claims asserted in the complaint.

Summary judgment is **GRANTED** to Defendant on Defendant's counterclaim.

The court **DECLARES** that under Michigan law:

(1)     Pursuant to the Michigan Revenue Bond Act, MICH. COMP. LAWS § 141.121(3), Defendant has a valid lien on the property described in Attachment "A" to the Lighting Agreement executed by the defendant and the Brewery Creek Condominium Association on April 1, 2004 – including all improvements, buildings and appurtenances on said property – for all amounts owing pursuant to said Lighting Agreement, and for any interest on said unpaid charges; and

(2)     Pursuant to the Michigan General Property Tax Act, MICH. COMP. LAWS § 211.60a(4), Defendant's lien is senior to and preferred over any mortgage lien or other lien which is or may hereafter be held by the plaintiff.

(3)     Pursuant to the Michigan Revenue Bond Act, MICH. COMP. LAWS § 141.121(3), Defendant is entitled to collect any unpaid Lighting Agreement charges and enforce its lien "in the same manner provided for collection of taxes assessed upon the roll and the enforcement of the lien for the taxes."

No later than Thursday, October 14, 2010, the parties shall confer and **JOINTLY FILE a statement of agreed-upon damages, pre-judgment interest, and post-judgment interest** which the plaintiff owes to the defendant through and including Friday, October 15, 2010.[8][9]

---

[8]

"When a federal court enters a judgment for monetary damages on a state-law claim, 'federal law controls post-judgment interest but state law governs awards of prejudgment interest.'" *Pinika, LLC v. MetLife*, – F. Supp.2d –, –, 2009 WL 2713262, *12 (W.D. Mich. Aug. 24, 2009) (Paul L. Maloney, C.J.) (citing *Estate of Riddle v. So. Farm Bur. Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005)). This rule applies even when the judgment involves no damages on a federal-law claim. *See Pinika*, 2009 WL 2713262 at *12 (citing *Chouinard v. KinderCare Learning Ctrs., Inc.*, 2008 WL

"This is <u>not</u> a final and immediately-appealable order, because the court has not yet entered judgment for a sum certain." *Metro. Hospital, Inc. v. HHS*, – F. Supp.2d –, –, 2010 WL 1379600, *18 (W.D. Mich. Apr. 5, 2010) (Maloney, C.J.); *see Morgan v. Union Metal Mfg.*, 757 F.2d 792, 795 (6th Cir. 1985)) (noting "the longstanding rule that a determination as to liability, prior to a determination on the issue of damages or other relief requested, is not a final appealable judgment.").[10]

_____

913322, *3 (M.D. Tenn. Mar. 31, 2008)).  The federal post-judgment interest statute provides:

> Interest *shall* be allowed on any money judgment in a civil case recovered in a district court.  * * *  Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors for the Federal Reserve System, for the calendar week preceding the date of judgment.

28 U.S.C. § 1961(a) (emphasis added).  As the word "shall" suggests, post-judgment interest under this statute is mandatory.  *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002)).

"Interest shall be computed daily to the date of payment except as provided in [28 U.S.C. § 2516(b)] and [31 U.S.C. § 1304(b)], and shall be compounded annually."  28 U.S.C. § 1961(b).  For daily interest rates, the parties are referred to http://www.federalreserve.gov/releases/h15 ("Federal Reserve Statistical Release, H. 15 Selected Interest Rates (Weekly)."  Finally, post-judgment interest is calculated not only on compensatory damages, but on the sum of those damages plus prejudgment interest.  *See Pinika*, 2009 WL 2713262 at *12 (citing *City of Owensboro v. Ky. Utils. Co.*, 2009 WL 424996, *1 (W.D. Ky. Feb. 19, 2009) (McKinley, J.)).

[9]The Lighting Agreement does not contain an attorney-fee provision.  *See* P's MSJ Ex 7.

[10]

*Cf. Shelley v. Texas Eastern Transmission, Inc.*, Nos. 89-6176 & 89-6513, 894 F.2d 408, 1990 WL 5307, *1 (6th Cir. Jan. 26, 1990) (p.c.) ("An order granting attorney's fees which does not quantify the amount to be awarded is not a final, appealable order.") (citing *Morgan*, 757 F.2d 792).

FED. R. CIV. P. 56(d)(2) authorizes the court to enter a so-called "interlocutory summary judgment . . . on liability alone, even if there is a genuine issue on the amount of damages."  *See, e.g., Joe Hand Promotions, Inc. v. Easterling*, 2009 WL 1767579, *2 (N.D. Ohio June 22, 2009) (James Gallas, U.S.M.J.) (entering interlocutory summary judgment on liability but finding genuine issues of material fact existed as to proper damages under statutes).  Here, however, the court does not anticipate serious disagreement over the proper amount of damages and interest or any resulting

**IT IS SO ORDERED** on this 7<u>th</u> day of September, 2010.

/s/ Paul L. Maloney      
Honorable  Paul L. Maloney
Chief United States District Judge

---

delay after the filing of the joint statement.